

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JAM/KM
F. #2022R00179

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 23, 2024

By ECF

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *United States v. Nikita Arkhipov et al.*
              Criminal Docket No. 23-429 (NGG)

Dear Judge Garaufis:

      The government respectfully submits this letter in advance of the defendant Nikolay Grigorev's sentencing, which is scheduled for October 31, 2024. On April 30, 2024, the defendant pleaded guilty to Count One of the above-captioned indictment, charging Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371. The defendant's advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") is 30 to 37 months' imprisonment, which the defendant stipulated to in a written plea agreement with the government.

      For the reasons discussed herein and in consideration of the factors set forth in Title 18, United States Code, Section 3553(a), the government requests that the Court impose an incarceratory sentence. While several factors may support a sentence below the advisory Guidelines range, given the seriousness of the offense conduct, the need to promote respect for the law and general deterrence, the government believes some punitive sentence is necessary and appropriate in this case.

I. <u>Relevant Background</u>[1]

A. <u>The Export Control Reform Act and Export Administration Regulations</u>

On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which included the Export Control Reform Act ("ECRA"). See 50 U.S.C. § 4801 et seq. ECRA provided permanent statutory authority for the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774.

ECRA provides that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specified activities of United States persons, wherever located, be controlled." 50 U.S.C. § 4811. To that end, ECRA granted the President the authority to "(1) control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information. Id. § 4812. ECRA granted to the Secretary of Commerce the authority to establish the applicable regulatory framework. Id. § 4813.

Through the EAR and ECRA, the U.S. Department of Commerce's Bureau of Industry and Security ("BIS") reviews and controls the export from the United States to foreign destinations of certain items. In particular, BIS places restrictions on the export and reexport of items that it determines could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

The most sensitive items are identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items listed on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which is subject to export control requirements depending on destination, end use, and end user of the item.

Since February 24, 2022, when Russia launched its invasion of Ukraine, BIS has implemented a series of stringent export controls that restrict Russia's access to certain technologies and other items that it needs to sustain its attack on Ukraine. As of April 8, 2022, license requirements for exports, reexports, and transfers to or within Russia were expanded to cover all items on the CCL. See 87 Fed. Reg. 12226 (Mar. 3, 2022); 87 Fed. Reg. 22130 (Apr. 14, 2022); 15 C.F.R. § 746.8. Through the EAR, BIS also publishes the Entity List, which identifies certain foreign persons—including businesses, research institutions, government and private organizations, individuals, and other types of legal persons—that are subject to specific export license requirements and policies, in addition to those found elsewhere in the EAR, due to a determination that such persons have engaged in activities contrary to U.S. national security and/or foreign policy interests. See 15 C.F.R. § 744.11; 15 C.F.R. Part 744, Supp. No. 4.

---

[1] Unless otherwise noted, the following facts are taken from the Presentence Investigation Report dated October 11, 2024, and the factual record in this case.

Under ECRA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the statute, including the EAR.  See 50 U.S.C. § 4819(a)(1).

Additionally, an exporter of goods from the United States is required to file information with the U.S. government about the intended exports under certain circumstances.  Specifically, an exporter is required to file Electronic Export Information ("EEI") through the Automated Export System ("AES") when, among other reasons, an export license was required, or the value of the commodity being exported was more than $2,500.  15 C.F.R. § 758.1.  The EEI requires an exporter to list, among other things, the destination country, the ultimate consignee's name and address, the intermediate consignee's name and address, and a description of the commodity to be exported.  Failure to file EEI or providing false or misleading information in EEI is a violation of ECRA (see, e.g., 50 U.S.C. 4819(a)(2)(F)), the EAR (see 15 C.F.R. Part 758), 13 U.S.C. § 305, and the Foreign Trade Regulations (see 15 C.F.R. Par 30).

### B.   SMT-iLogic and the Manufacture of Drone Vehicles

Since the Russian invasion of Ukraine in 2022, one of the main priorities of U.S. export controls and sanctions has been to prevent American dual-use electronic components from being used in the development and manufacture of unmanned aerial vehicles, known as drones, for the Russian war effort.

One of the most notable entities involved in Russian drone production is SMT-iLogic, a Moscow-based technology company.[2]  SMT-iLogic is associated with an entity known as the Special Technology Centre ("STC"), also known as STC, Ltd.  STC is a Russia-based entity that was added to the Department of Treasury's Office of Foreign Assets Control ("OFAC") Specially Designated Nationals and Blocked Person List ("SDN List") on or about December 29, 2016, for assisting the foreign military intelligence agency of Russia's armed forces, commonly known by the acronym "GRU," in conducting signals intelligence operations.  On or about January 4, 2017, STC was added by BIS to the Entity List for supporting the GRU.  On or about May 19, 2023, SMT-iLogic was also added to the SDN List.

STC is involved the production of the "Sea Eagle Orlan 10 UAV," a drone vehicle that has been involved in Russian military operations in Ukraine.[3]  STC's biggest customer, according to the same reporting, is Russia's Ministry of Defense, which paid STC the equivalent of nearly $99 million between February and August of 2022.  According to public reporting, iLogic shares an address with STC in St. Petersburg, Russia, was founded by top scientist and major shareholder of STC, and has imported millions of dollars' worth of electronics into Russia.

---

[2]   https://www.reuters.com/world/europe/global-supply-trail-that-leads-russias-killer-drones-2022-12-15/ (last visited August 8, 2024).

[3]   https://www.rusi.org/explore-our-research/publications/special-resources/orlan-complex-tracking-supply-chains-russias-most-successful-uav (last visited August 8, 2024).

### C. Overview of the Criminal Scheme

The indictment charges Grigorev and two other defendants with conduct related to an export control and smuggling scheme involving the Brooklyn-based company Quality Life Cue LLC ("QLC"), controlled by defendants Grigorev and Artem Oloviannikov. Since in or about 2019, the defendants were involved in procuring dual-use electronic components for SMT-iLogic. Notably, between October 22, 2021 and February 22, 2022, QLC received wire transactions from iLogic totaling approximately $272,830.40. These funds were used almost entirely to make payments to a Brooklyn-based electronics distributor (the "Brooklyn Company") or to pay Grigorev's credit cards, which he used to buy goods from the Brooklyn Company.

Prior to Russia's 2022 invasion of Ukraine, QLC openly purchased electronic components for SMT-iLogic, falsely representing on end use forms that the items would not be used for any "Controlled End Uses," which includes use in "unmanned air vehicles (including…target drones, and reconnaissance drones)." However, following the imposition of sanctions against Russian entities, the defendants sought to further obscure the ultimate Russian end user of items, unlawfully shipping thousands of electronic components to Russia. Specifically, after the Brooklyn Company informed Grigorev that it would no longer fulfill orders to Russia or Belarus, the defendants actively conspired to defraud the Brooklyn Company and unlawfully export additional electronic components to Russia. Email and chat communications amongst the defendants explicitly reference efforts to circumvent U.S. sanctions, use "test" or "fictitious" orders to test new supply lines, and transship through front companies in third countries.

One commercial invoice for QLC, dated February 10, 2022, listed approximately 118 different electronic devices—totaling over 25,000 items—that were ostensibly to be shipped to a company in Turkey, which was also listed as the consignee/ultimate consignee on the air waybill and the EEI filing. However, on or about June 10, 2022, the shipment was actually sent to Estonia, not Turkey, and then smuggled into Russia through Narva, Estonia. BIS records reveal that no license was applied for or obtained by QLC to export the items to Russia, and invoices exchanged via email reflect that SMT-iLogic was the true end user.

Electronic communications amongst the defendants reflect the defendants' awareness and intention to circumvent U.S. export restrictions through fraud.

Specifically, in a Telegram chat on or about February 24, 2022, the defendants discussed sanctions imposed against Russia, with defendant Oloviannikov sending a news article to Grigorev and stating, "the U.S. Ministry of Commerce issued a release on export restrictions for Russia. The list will include semiconductors, computers, telecommunications equipment, lasers and sensors." Grigorev responded, "and when does it come into effect? Aa, I see today." A subsequent Telegram chat amongst the defendants in March 2022 reads as follows, in pertinent part:

March 11, 2022:

> ARKHIPOV: Kolyan [GRIGOREV] please specify which countries you can not work with

4

OLOVIANNIKOV: Russia Belarus

ARKHIPOV: That's 100%.

GRIGOREV: Well yes, there is obviously

ARKHIPOV: There is a possibility that the rest of the CIS countries may also be on the list

GRIGOREV: Probably more North Korea granddaughter banned

GRIGOREV: * most likely

GRIGOREV: Who is not sanctioned – those you can work with

ARKHIPOV: So if end user is conditionally from Kazakhstan, then it will be ok?

[…]

OLOVIANNIKOV: Kazakhstan +- risky, but if it is then yes, eff it

[…]

OLOVIANNIKOV: Turkey will but will take time …

March 14, 2022:

ARKHIPOV: Kolyan [GRIGOREV] can ask you to send a letter to Mini with the question of which countries we can work with?

[…]

At least we'll have an official's paper for the fire

[…]

GRIGOREV: Yes, with all the countries you can except Iran, Russia, Cuba, north Korea and those on which we are completely groin. Here all sanctions are aimed at Russia and Belarus and none of those listed.

[…]

ARKHIPOV: Then will be through the Kazakhs probably send

[…]

5

ARKHIPOV: Tomorrow I will try to get the name of the company

March 18, 2022:

ARKHIPOV: Kolyan in the attachment of the card of the client from Kazakhstan

[…]

ARKHIPOV: end user

GRIGOREV: What exactly do we order?

ARKHIPOV: In the future we will if its Mini approved by

ARKHIPOV: want through this company now to carry out the details of

ARKHIPOV: Now I am looking for an alternative solution together with them.

GRIGOREV: Honestly, I would not raise the issue of approval / disapproval … we have to drop a test order.

ARKHIPOV: Good Idea

ARKHIPOV: Come on, I'll sketch it out now and send

GRIGOREV: It's a very small order.

ARKHIPOV: OK

GRIGOREV: They will refuse – then everything will be clear, but it will pass – then we will continue

ARKHIPOV: [attachment]

ARKHIPOV: Sent email

      In addition, in a message exchange in December 2022, Grigorev noted the negative press coverage of SMT-iLogic and stated "they are already writing about your guys in articles about how Russia is getting American components for drones."

      Following the aforementioned June 2022 shipment to Russia via Estonia, the defendants unsuccessfully attempted to make additional shipments. In June 2023, a court-authorized search warrant of Grigorev's residence in Brooklyn interdicted over 11,500 electronic components purchased from the Brooklyn Company that were awaiting unlawful export to Russia. Grigorev agreed to speak to law enforcement at that time, and largely admitted to the offense

conduct. Grigorev did claim that he had been unaware that SMT-iLogic was involved in the production of military drones and was unaware that the June 2022 shipment had been illicitly routed to Russia through Estonia.



II.   Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." Id. at 49–50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." United States v. Sindima, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original) (superseded by statute on other grounds). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." United States v. Aldeen, 792 F.3d 247, 251–52 (2d Cir. 2015), as amended (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)) (superseded by statute on other grounds).

---

4 

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; [and]
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding regarding the correct range. However the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of the case.

### III.  Analysis

#### A.  Sentencing Calculation

The plea agreement and Probation calculated the defendant's offense level as category 19, as follows:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. §§ 1B1.2(a), 2X5.1, and 2M5.1(a)(1)) | | +26 |
| Less: | Adjustment for Minor Role in Offense (§ 3B1.2(b)) | -2 |
| Less: | Zero Criminal History Offender (§§ 4C1.1(a), (b)) | -2 |

    Less:  Acceptance of Responsibility (§§ 3E1.1(a), (b))  -3

    Total:  <u>19</u>

Based upon this calculation, the defendant's advisory sentencing range is 30 to 37 months' imprisonment.

  B. <u>Section 3553(a) Factors</u>

The sentencing factors articulated in 18 U.S.C. § 3553(a) underscore the need for a Guidelines sentence.

    1. <u>The Nature and Circumstances of The Offense</u>

As an initial matter, the "nature and circumstances of the offense" are serious. The defendant Grigorev participated in exporting electronic components that play a critical role in the production of Russian military drones. Simply put, Russia cannot manufacture these parts itself. They need people like Grigorev that are based in the United States to lie to American companies and unlawfully ship these essential components to Russia.

Russia's war on Ukraine is in its third year, and it is worth noting a few of the remarkable facts about this devastating war, which has been fueled in part by the illegal activity of people like the defendant:

- "More buildings have been destroyed in Ukraine than if every building in Manhattan were to be leveled four times over."[5]

- More than 900 schools, hospitals, churches, and other institutions have been damaged or destroyed, the analysis shows, even though these sites are explicitly protected under the Geneva Conventions.[6]

- U.S. officials estimated that nearly 500,000 people had died over the course of the war as of August 2023.[7]

A punitive sentence will take into account the seriousness of the defendant's conduct.

---

[5] https://www.nytimes.com/interactive/2024/06/03/world/europe/ukraine-destruction.html (last visited July 1, 2024).

[6] <u>Id.</u>

[7] https://www.nytimes.com/2023/08/18/us/politics/ukraine-russia-war-casualties.html (last visited July 1, 2024).

2. <u>Specific and General Deterrence</u>

While the government does not believe the defendant needs to be specifically deterred from engaging in similar conduct in the future, there is a need for general deterrence in this case.

General deterrence is necessary because, unfortunately, as quickly as these prosecutions are brought, other procurement networks are set up to replace them and continue to support the Russian war effort. These procurement networks require an entire ecosystem of individuals and businesses to succeed—from the individuals who agree to acquire the goods, to the companies that sell the goods, to the freight forwarders who export the goods, to the banks that process the transactions. A significant sentence will send a message to each of these links in the chain and warn them that participating in the illegal export of goods to Russia will result in imprisonment and other consequences. Indeed, even those entities and individuals who may not have been aware that their conduct was unlawful are more likely to engage in rigorous review of transactions and other compliance activity if they know that the failure to do so may result in serious criminal consequences.

3. <u>Mitigating Factors</u>

There are significant mitigating factors in this case. In addition to the history and characteristics described in the Presentence Investigation Report ("PSR"), <u>see, e.g.</u>, PSR ¶¶ 46–58, when initially approached by law enforcement, the defendant largely admitted to the offense conduct. ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

Additionally, the defendant's timely guilty plea, which occurred very early during the pendency of the case, saved both the government and the Court's time and resources in litigation. While the defendant has already received a downward adjustment under the Guidelines for acceptance of responsibility, his contrition may also be considered by the Court as relevant to his "history and characteristics." 18 U.S.C. § 3553(a)(1), <u>see also</u> <u>United States v. Broxmeyer</u>, 699 F.3d 265, 295 (2d Cir. 2012) (stating that acceptance of responsibility may be considered during the 3553(a) analysis and "further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); <u>accord</u> <u>United States v. Kaziu</u>, 559 F. App'x 32, 39 (2d Cir. 2014) (summary order).

IV.    <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court impose an incarceratory sentence. While the Section 3553(a) analysis outlined above may support a downward variance from the Guidelines, the Court's sentence must address the seriousness of the offense, the need for general deterrence and promote respect for the law.

                                          Respectfully submitted,

                                          BREON PEACE
                                          United States Attorney

                        By:    /s/
                                Artie McConnell
                                Kate Mathews
                                Assistant U.S. Attorneys
                                (718) 254-7000

cc:    Clerk of the Court (NGG) (by ECF and E-mail)
        Defense Counsel (by ECF and E-mail)